# EXHIBIT A

Jesse C. Kodadek
WORDEN THANE P.C.
321 W. Broadway, Suite 300
Missoula, MT 59802
(406) 721-3400
jkodadek@wordenthane.com

MONTANA FOURTH JUDICIAL DISTRICT COURT
MISSOULA COUNTY

| BRIAN SALONEN,<br><br>*Plaintiff*,<br><br>v.<br><br>JACKSON NATIONAL LIFE INSURANCE COMPANY,<br><br>*Defendant*. | Cause: DV–18–383<br><br>Dept. 2<br><br>**First Amended Complaint and Demand for Jury Trial** |
|---|---|

## PARTIES, JURISDICTION, & VENUE

1. Plaintiff Brian Salonen is a resident of Missoula County, Montana.

2. Salonen is a financial representative and licensed insurance broker, and has been an agent of Jackson in good standing for over two decades.

3. Upon information and belief, Jackson National Life Insurance Company is a Michigan entity.
4. Jackson is authorized to and does sell insurance and annuity products in Montana, primarily through independent contractors like Salonen.
5. This case concerns false and defamatory statements that were published by Jackson to various Montana residents.
6. The Court has jurisdiction over Jackson because it transacts substantial business in Montana with residents of Montana.
7. Venue is proper in Missoula County under § 25–2–122, MCA.

## FACTS COMMON TO ALL CLAIMS

8. Salonen is a Montana native, and grew up in Great Falls.
9. Salonen attended the University of Montana at Missoula on a football scholarship, where he played tight end.
10. Salonen finished his college career as the school's all-time leading receiver, and made the conference's all-academic list three years in a row. He is a member of the Montana Football Hall of Fame.
11. After college, Salonen played in the NFL for the Dallas Cowboys.

12. Following his football career, Salonen returned to Missoula and began working as a financial representative, where he specializes in educating his clients on how to protect their wealth and make their financial situation more tax efficient through a variety of strategies.

13. Salonen has over 29 years of experience in business succession/transfer planning and estate planning while working with clients all across the country. His practice also involves the areas of retirement plans, life insurance, disability insurance, and guaranteed annuities.

14. Salonen's business is almost entirely referral-based, and thus his reputation for competence, honesty, long-term reliability, integrity, and trustworthiness is essential to his business success.

15. Because Salonen's business is based on personal and professional relationships, Salonen has worked hard to be a contributing member of the community, and has volunteered personally and professionally in a wide variety of capacities over the past three decades.

16. Besides Jackson, Salonen has contracts with a wide variety of companies selling insurance, annuities, and other financial products and services.

17. As an independent broker, Salonen helps his clients select the best financial products and services for their specific needs.

18. As an independent broker, Salonen regularly puts together insurance packages for clients that earn him five figures in commission at a time.

19. Jackson mandates that its agents complete a Jackson-specific anti-money laundering (AML) training module once every two years.

20. On March 1, 2017, Salonen completed Jackson's AML training, as reflected in Jackson's own records.

21. Salonen was therefore compliant with Jackson's required AML training until March 1, 2019.

22. On January 11, 2018, Jackson sent Salonen a letter, stating that he had failed to complete his AML training, and therefore "Jackson has ended its contractual relationship with you, and your appointment(s) with Jackson * * * has been terminated under the terms of the Jackson producer agreement."

23. Upon receipt of the letter, Salonen and his assistant Melinda Magstad immediately notified Jackson that it had made a mistake, and that he was compliant with the AML training.

24. On the same day Salonen received the letter, Jackson informed Magstad that she and Salonen were correct, that Salonen was compliant with the AML training, and that he remained an agent of Jackson, in good standing.

25. Believing the matter to be resolved, Salonen moved on and got back to work.

26. Unbeknownst to Salonen, however, on January 12, 2018, Jackson sent a letter to every single one of Salonen's clients who had a Jackson product.

27. In that letter, Jackson wrote:

> The purpose of this letter is to inform you that BRIAN S SALONEN is no longer appointed with Jackson National Life Insurance Company (Jackson) as an insurance agent/broker. BRIAN S SALONEN is no longer authorized to sell or service Jackson products or to transact any business on your behalf with Jackson.
>
> Please feel free to call the Jackson Service Center at (800) 645-4565 if you have any questions or need information about your policy.

28. Salonen did not learn of this second letter until he started hearing from clients who were confused and upset by the false representation that Salonen had been terminated by Jackson, and by the suggestion that they could no longer rely on Salonen to sell or service Jackson products.

29. Salonen and his assistants fielded a number of calls in the few days after his clients received the letter. Addressing the issue was distressing and time-consuming for everyone involved.

30. One of Salonen's clients of over 15 years expressly stated that he believed the letter damaged Salonen's reputation.

31. During this time, a Jackson manager apologized to Salonen "for the horrible termination in error of your appointment," and then stated that Jackson was in the process of personally contacting everyone who had received the termination.

32. On January 23, 2018, without consulting Salonen as to form or content, Jackson sent a letter to everyone who had received the January 12 letter, stating that it "made an error" when it sent out the earlier letter stating that Salonen was "no longer appointed with Jackson, and therefore, unable to transact business on your behalf."

33. The letter did not explain the context of the January 12 letter.

34. Later, at a community event, the president of a regional bank and a Salonen client—though not a Jackson customer—came up to Salonen and, in front of a number of people, asked him about "this deal with your termination."

35. Salonen has learned that non-Jackson clients, some in other Montana cities, are hearing about how he was purportedly fired by an insurance company.

36. Some of these individuals apparently believe that Salonen was terminated by companies other than Jackson.

37. Based on these developments, Salonen now understands that an unknown and ultimately unknowable number of people in western Montana have been falsely informed that his relationship with an insurer was involuntarily terminated.

38. Salonen's reputation has been irrevocably tarnished.

39. Salonen reasonably believes that his career will never be the same because of the letter that Jackson sent.

40. Jackson has since informed Salonen's assistant that somebody entered a wrong code in Jackson's computer system, which caused

the January 12 letter to be sent to Salonen's clients who had purchased Jackson products.

41. If Jackson would have called or emailed Salonen or his office prior to sending the January 12 letter, it would have learned that Salonen was compliant with his Jackson-mandated and Jackson-facilitated AML training.

42. If Jackson had reviewed its own records prior to sending the January 12 letter, it would have learned that Salonen was compliant with Jackson-mandated and Jackson-facilitated AML training.

43. As a result of Jackson's actions, Salonen has suffered and will continue to suffer lost client leads, lost productivity, and lost commissions and profits.

44. As a result of Jackson's actions, Salonen has suffered and will continue to suffer from emotional distress, including grief, shame, humiliation, embarrassment, anger, and disappointment.

45. As a result of Jackson's actions, Salonen will always wonder whether the people he already knows and the people he will meet in the future will reasonably believe that he engaged in some sort of malfeasance or misfeasance that caused him to be terminated.

## COUNT 1—DEFAMATION & DEFAMATION PER SE

46. Salonen reallages the preceding allegations as if fully set forth in this part.

47. The January 12 letter contained false statements about Salonen's status or, alternatively, the statements were false by the time they were read by Salonen's clients.

48. Those statements were not privileged.

49. The statements in the January 12 letter exposed Salonen to hatred, contempt, ridicule, or obloquy, and had the tendency to injure him in his occupation.

50. The statements in the January 12 letter not only caused clients to shun or avoid Salonen, but *mandated* that Jackson customers communicate with Jackson directly, rather than Salonen, about their Jackson financial products.

51. Consistent with statutory law, common law, and Article II, § 7 of the Montana Constitution, Jackson is responsible for all damages to Salonen resulting from its false and defamatory publications about him.

52. Due to Jackson's false and defamatory publications, Salonen has suffered damages in an amount to be proven at trial.

## COUNT 2—NEGLIGENCE

53. Salonen realleges the preceding allegations as if fully set forth in this part.

54. Jackson had a duty to Salonen—separate from and independent of any contractual duty[1]—to conduct even a modicum of due diligence prior to sending out a letter with information about Salonen that could harm his career.

55. By sending out the January 12 letter without first contacting Salonen or reviewing its own internal records, Jackson breached that duty.

56. As a proximate result of Jackson's breach, Salonen has suffered damages in an amount to be proven at trial.

## COUNT 3—PUNITIVE DAMAGES

57. Salonen realleges the preceding allegations as if fully set forth in this part.

58. In both its defamatory and negligent conduct, Jackson acted with actual malice because it had knowledge of facts, or intentionally

[1] Salonen is not bringing any sort of contract-based or contract-related claim against Jackson.

disregarded facts, that created a high probability of injury to Salonen. Jackson then proceeded to act in conscious or intentional disregard or with indifference to the high probability of injury to Salonen.

59. Salonen is entitled to punitive damages in an amount to be established at trial.

## PRAYER FOR RELIEF & DEMAND FOR JURY TRIAL

Consistent with the unique mandates of Article II, § 7 of the Montana Constitution, which directs that juries shall determine both the law and the facts in a defamation case, Salonen respectfully requests that the Court oversee a jury trial and then:

A. Enter a money judgment in favor of Salonen against Jackson for general and special damages;

B. Enter a money judgment in favor of Salonen against Jackson for punitive damages;

C. Award Salonen costs as allowed by law;

D. For any other relief the Court deems just and proper.

June 7, 2018.

Jesse C. Kodadek
WORDEN THANE P.C.